**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| HANS C. WILZ, | : | CIVIL ACTION NO. |
| 1549 N. Van Buren Ave. | : | |
| Ottumwa, IA 52501, | : | |
| | : | JUDGE |
| Plaintiff, | : | |
| | : | MAGISTRATE JUDGE |
| v. | : | |
| | : | |
| SOLARX EYEWEAR, LLC, | : | **COMPLAINT** |
| c/o Christopher A. Corpus | : | |
| 151 Innovation Dr., Ste. 260G | : | |
| Elyria, OH 44035, | : | |
| | : | **Jury Demand Endorsed Hereon** |
| Defendant. | : | |

### I. Preliminary Statement

1. This diversity action seeks declaratory, injunctive, and equitable relief, including an accounting; economic damages; prejudgment and post-judgment interest; costs; and attorneys' fees for the bad-faith breach of contract, in violation of the covenant of good faith and fair dealing, committed by Defendant SolarX Eyewear, LLC ("SPX") when it concocted cause to avoid its contractual obligation to Plaintiff Hans C. Wilz ("Mr. Wilz" or "Plaintiff"), first laying him off and then effectively terminating him without cause even though under the express terms of his Employment Agreement, a true and accurate copy, except for the exhibits to the employment agreement, of which is attached hereto as Exhibit A, SPX guaranteed him three years of employment.

### II. Jurisdiction and Venue

2. This action brings a contract claim under the common law of the State of Ohio and invokes the diversity of citizenship jurisdiction of this Court under 28 U.S.C. §1332.

-- 1 --

3. Diversity jurisdiction is appropriate as the amount in controversy, primarily more than two years of annual base salary and commissions of more than $200,000, as well as benefits and more than $10,000 in unreimbursed business expenses, far exceeds $75,000.

4. Declaratory, injunctive, and equitable relief are sought pursuant to 28 U.S.C. §§ 2201; 2202; and Fed.R.Civ.P. 65.

5. Economic damages are sought pursuant to the common law of the State of Ohio

6. Costs and attorney fees may be awarded pursuant to the common law of the State of Ohio governing the shifting of fees for bad-faith breaches of contract in violation of the implied covenant of good faith and fair dealing and Fed. R. Civ. P. 54.

7. Venue lies in this forum pursuant to 29 U.S.C. § 1391(b) and S.D. Ohio Civ.R. 82.1 because Mr. Wilz performed his duties in the city of his residence, Ottumwa, IA, for SPX which is headquartered at 14850 Foltz Parkway, Strongsville, OH 44149, located in Cuyahoga County, Ohio, and SPX Employment Agreement with Mr. Wilz establishes an Ohio venue.

### III. Parties

8. Plaintiff Hans C. Wilz is a resident of the State of Iowa; was the owner of Great Ideas L.L.C. ("GI") before it was sold, pursuant to an Asset Purchase Agreement, to SPX on April 29, 2019; had worked in the direct-import field for more than two decades; became Director of Sales for SPX by executing an Employment Agreement (a true and accurate copy of which is attached as Exhibit A hereto) on April 29, 2019; performed his job duties in a competent fashion throughout his tenure as an SPX employee; and was laid off without pay on March 29, 2020, ostensibly due to the COVID-19 pandemic, and then told by SPX that he was no longer needed and SPX would move forward without him, having assigned his responsibilities to other SPX employees.

9. Defendant SolarX Eyewear, LLC is incorporated as a domestic limited liability company in the State of Ohio; locates its headquarters at 14850 Foltz Parkway, Strongsville, OH 44149, from where it directed Mr. Wilz's employment; purchased GI from Mr. Wilz, which engaged in selling, manufacturing, importing, and shipping consumer goods, under an Asset Purchase Agreement on April 29, 2019; registered with the Ohio Secretary of State "Great Ideas" as a tradename on June 4, 2019; has been doing business with Great Ideas as a subsidiary since shortly after its purchase; and has been a top manufacturer, importer, and wholesale distributor of sunglass eyewear in the United States through mall kiosks, travel plazas, convenient stores, and special events.

**IV.  Facts**

10. In § 3(a) of the Employment Agreement, under the heading, "Term and Position," SPX, identified as "Company," and Mr. Wilz, identified as "Employee," agreed to a fixed term of employment: "COMPANY employs EMPLOYEE, and EMPLOYEE accepts such employment for a guaranteed period of three years."

11. Under that Employment Agreement SPX set compensation for Mr. Wilz at an annual base salary of $200,000, plus commission on sales, the vacation, life insurance, medical, and hospitalization benefits SPX provided its other employees, and reimbursement for business expenses.

12. SPX is no longer paying Mr. Wilz that compensation, has agreed to continue his medical insurance through May, and has failed to completely reimburse him for business expenses.

13. SPX also promised to appoint Mr. Wilz as a non-voting director on its Board of Directors.

14. SPX never appointed Mr. Wilz to its Board of Directors.

15. SPX additionally promised that Mr. Wilz could participate in its 401k tax-qualified, defined-contribution pension account.

16. SPX never provided Mr. Wilz with information about the 401k or a form to apply for participation in the plan.

17. The Employment Agreement protected Mr. Wilz from termination without cause, stating in §6, under the heading "Termination and Further Compensation": "COMPANY may terminate EMPLOYEE only for Cause and with notice. In the event of termination of the Employment Agreement by the COMPANY for any reason other than Cause, EMPLOYEE shall be entitled to all further salary, bonus or other benefits due hereunder through the end of the term."

18. The Employment Agreement defined cause to include debtor actions or bankruptcy proceedings against Mr. Wilz; any false or misleading warranty or representation; unauthorized or improper use of trademarks or intellectual property; death; conviction of a felony or a crime involving fraud, theft, embezzlement, or moral turpitude; and/or committing "an act of gross negligence, willful misconduct, or breach of fiduciary duty."

19. Since execution of the Employment Agreement, no debtor actions or bankruptcy proceedings have been brought against Mr. Wilz.

20. Since execution of the Employment Agreement, Mr. Wilz had never made any false or misleading warranty or representation, nor had he done so in negotiations and disclosure surrounding the Asset Purchase Agreement.

21. SPX never notified Mr. Wilz that he had made any false or misleading warranty or representation.

22. Regarding a separate sale of Sweet Bird & Co., which involved Mr. Wilz and two partners not parties to the GI sale, SPX had criticized Mr. Wilz for an unanticipated reduction in business from Bed Bath & Beyond, a large home goods retailer in North America.

23. Mr. Wilz lacked any inside knowledge or other advance indication that Bed Bath & Beyond would significantly reduce its business with GI.

24. SPX had the opportunity, before its purchase of Sweet Bird & Co., to determine whether Bed Bath & Beyond would continue its level of business.

25. SPX failed, before its purchase of Sweet Bird & Co., to exercise due diligence to determine whether Bed Bath & Beyond would continue its level of business.

26. Mr. Wilz provided SPX, before its purchase of Sweet Bird & Co., with documents and materials revealing the level of business Sweet Bird & Co. had done with Bed Bath & Beyond.

27. Since execution of the Employment Agreement, Mr. Wilz has not made unauthorized or improper use of SPX's trademarks or intellectual property.

28. Since execution of the Employment Agreement, SPX never notified Mr. Wilz that he had made unauthorized or improper use of its trademarks or intellectual property.

29. Mr. Wilz remains alive.

30. Since execution of the Employment Agreement, Mr. Wilz has not been convicted of a felony or a crime involving fraud, theft, embezzlement, or moral turpitude.

31. Since execution of the Employment Agreement, SPX never notified Mr. Wilz that he had been convicted of a felony or a crime involving fraud, theft, embezzlement, or moral turpitude.

32. Since execution of the Employment Agreement, Mr. Wilz never committed an act of gross negligence, willful misconduct, or breach of fiduciary duty.

33. Since execution of the Employment Agreement, SPX never notified Mr. Wilz that he had committed an act of gross negligence, willful misconduct, or breach of fiduciary duty.

34. In a written warning on stationery with the legend "SPX Brands," dated January 10, 2020, SPX explained that oral counseling had not sufficed to deal with Mr. Wilz's performance and disciplinary problems and it was escalating as provided by the Employee Handbook to the written warning.

35. The only issues specified in the written warning were "unsatisfactory sales" and "failure to respond to your Supervisor's inquiries in a timely manner for information that is required to manage and operate the company."

36. The written warning scheduled for January 28, 2020, a meeting in Cleveland with Mr. Wilz's supervisor and company ownership to discuss a path forward.

37. SPX has not provided Mr. Wilz oral counseling of the sort envisioned by the Employee Handbook; instead, his supervisor had conversations with him about sales and job performance, none of which involved counseling.

38. Unsatisfactory sales were not listed in the Employment Agreement as cause for termination.

39. Actually, sales and profitability at GI for 2019 were higher than projected.

40. A pandemic, such as COVID-19, and its impact on sales were not listed in the Employment Agreement as cause for termination, nor was laying-off Mr. Wilz mentioned as an exception to his guaranteed employment.

41. Mr. Wilz had consistently responded to the best of his ability in as timely a manner as he could to inquiries from his supervisor for information.

42. SPX never provided Mr. Wilz training on its product lines apart from GI.

43. SPX never provided the GI Iowa office with information technology equipment or software to facilitate the work of employees there.

44. SPX President, John W. Norris, repeatedly told Mr. Wilz that SPX employees "hated" Mr. Wilz and thought his designs were "shit."

45. Mr. Wilz was taken aback by both revelations, believed he had good working and personal relationships with SPX employees, and was proud of his design work and the contributions that design work had made to GI's success.

46. SPX President Norris also emphasized that both Mr. Wilz and Cathryn Boggs, the other SPX employee in Iowa who had been employed by GI before the sale to SPX, were being overpaid because the salary and commissions in their Employment Agreements were more generous than the compensation for SPX employees.

47. Mr. Wilz agreed in the Employment Agreement with SPX to comply with its policies and procedures, including those in its Employee Handbook.

48. Separate from the "Termination and Further Compensation" section in the Employment Agreement was a statement in §2.(d), "Failure to comply in all material respects with all such policies and procedures shall be grounds for disciplinary action, including termination of employment."

49. The SPX Employee Handbook, using one of its trade names, Solar Giant, provided, in pertinent part, that "employment is terminable at will" and "no contract of employment other than 'at will' has been expressed or implied, and that no circumstances arising

-- 7 --

out of employment will alter my 'at will' employment relationship unless specifically expressed in writing and signed by myself and the President of The Solar Giant."

50. Mr. Wilz's Employment Agreement with SPX was express, signed by President Norris, and created a for-cause, rather than at-will, employment relationship.

51. According to the Employee Handbook, regardless of when an employee was hired, an annual performance review will be completed no later than January 21 of the year following the year being reviewed.

52. SPX did not make a timely annual performance review of Mr. Wilz.

53. In mid-October 2019, Mr. Wilz visited factories, suppliers, and freight companies in Asia and was accompanied by Jay Butterworth, an SPX partner.

54. Mr. Wilz fully informed Mr. Butterworth about the factories, suppliers, and freight companies and also reported the critical comments President Norris had made and the dismay he felt about those comments.

55. A considerable amount of SPX business both Sweet Bird & Co. is generated at trade shows where retailers observe displays; discuss modifications, prices, and shipping; and place orders months in advance of the arrival date, while some GI business follows that pattern and the rest if largely done through visits to existing or potential customers.

56. For years Mr. Wilz rented, set up, staffed, and took down Sweet Bird & Co. and GI displays at trade shows.

57. To set up a display, Mr. Wilz had to transport or ship advertising and a sufficient wide display of products to lure customers.

58. The physical labor involved in setting up and taking down was significant because the product lines of Sweet Bird & Co. and GI included heavy products.

59. In November 2019, Mr. Wilz learned that he needed to have a hernia operation and recuperation time after that operation.

60. Mr. Wilz notified SPX about his condition, the need for an operation, and the projected recuperation time during which he would have weight-lifting restrictions through January 2020.

61. Mr. Wilz was entitled under the Family and Medical Leave Act (FMLA) to take leave for his hernia operation and recovery.

62. SPX was not permitted to take into negative account Mr. Wilz's FMLA-protected leave.

63. SPX never discussed with Mr. Wilz his rights under the FMLA.

64. Mr. Wilz was entitled to sick leave as a benefit SPX provided its employees.

65. SPX pressured Mr. Wilz to return to work nearly immediately after his hernia operation.

66. SPX insisted that Mr. Wilz set up, staff, and take down trade shows and conduct sales meetings in December and January even though they occurred during his recuperation time.

67. Mr. Wilz explained about the weight-lifting restrictions, which precluded him moving at trade shows pallets full of goods with boxes that often weighed 50 to 100 pounds, but SPX did not send any employee to assist him.

68. Ultimately, Mr. Wilz had a friend who was not employed by SPX come to a trade show to assist him.

69. Mr. Wilz reported to SPX owner Mike Mahoney both the dilemma he was facing with his weight-lifting restrictions and the SPX insistence on him doing trade shows without

SPX providing assistance, and he provided as background the comments by SPX President Norris about employees hating him and his designs being shit.

70. SPX issued an exaggerated and/or false written warning in order to create a paper trail for terminating Mr. Wilz.

71. The SPX Employee Handbook contained a general policy that progressive discipline would be used, starting with oral counseling, proceeding to a written warning, and culminating in termination if the agreed-upon action is not met within the stipulated period.

72. According the SPX Employee Handbook, its three-step system of progressive discipline was designed to ensure that employees are treated fairly and are given the opportunity to improve their performance and address their problems.

73. According to the SPX Employee Handbook, the oral counseling consisted of the opportunity for the supervisor and the employee to discuss the nature, source and a possible resolution of the problem.

74. Mr. Wilz's supervisor never discussed with him the nature, source, and/or a possible resolution of any performance or disciplinary problems.

75. SPX never stipulated a period within which agreed-upon action by Mr. Wilz would be completed.

76. Mr. Wilz continued working for SPX until his layoff without pay.

77. SPX never notified Mr. Wilz that he was being terminated for inadequate job performance.

78. Before his layoff Mr. Wilz introduced Mike Thompson from SPX to Great Ideas customers and facilitated his interaction with those customers.

79. The written warning dated January 10, 2020, was presented to Mr. Wilz on January 13, 2020, at the Atlanta, GA Marriott Marquis Hotel bar, which SPX had summoned Mr. Wilz to attend and SPX President Norris, owner Jay Butterworth, and sales executive Mike Thompson were present and later joined by some other SPX employees.

80. Mr. Wilz told them that he was ill at ease discussing his performance and discipline in that setting, especially when customers and professional acquaintances from a trade show were milling about, but they persisted.

81. SPX President Norris admitted telling Mr. Wilz that he was hated and his designs were shit.

82. SPX President Norris and others pressed Mr. Wilz on what he wanted to do in light of the written warning and the negative perceptions of SPX employees.

83. Mr. Wilz, feeling outnumbered and placed in an awkward and unprofessional position, asked to be allowed to return to his hotel room.

84. SPX intentionally and maliciously chose the setting and negative information to manipulate Mr. Wilz into resigning.

85. Mr. Wilz did not resign; instead, he appeared for work the next day, competently staffed the trade show, and met all the customer appointments he had scheduled.

86. Mr. Wilz did, however, discuss with Mike Mahoney how unhappy and disenchanted he had become with SPX, and they agreed to assess whether a walkaway deal could be arranged.

87. Mr. Wilz attended the January 28, 2020 meeting in Cleveland, and discussions focused on such a walkaway deal with SPX emphasizing that it wanted to be relieved of the compensation promises it had made to Mr. Wilz and Ms. Boggs.

88. The parties pursued those discussions after the January 28, 2020 meeting, but impasse was soon reached.

89. Before the travel restrictions caused by the COVID-19 pandemic, Mr. Wilz competently performed his job duties to the extent reasonably possible; for example, he staffed two other trade shows after the Atlanta one.

90. During the travel restrictions caused by the COVID-19 pandemic and before he was laid off, Mr. Wilz competently performed his job duties to the extent reasonable possible.

91. Under the heading, "Covenants of Non-competition and Confidential Information," §7 of Mr. Wilz's Employment Agreement with SPX had two triggers: for non-disclosure, §7.(a) provides that "Employee covenants and agrees so long as this Agreement is in effect, and after the termination of the Agreement," trade secrets and confidential information would not be disclosed, while for non-competition, §7.(b)(i) provides that "only in the event Employee is terminated by the Company for Cause or Employee leaves the employ of Company on Employee's own accord, Employee acknowledges" conditions, including a 24-month restricted period on competition in North America.

92. SPX has not terminated Mr. Wilz for cause.

93. Mr. Wilz has not left SPX on his own accord.

94. The restricted period for competition is not enforceable against Mr. Wilz.

95. An extensive dispute resolution process which starts with communicating issues, proceeds through a meeting at the executive level, and ends with arbitration was established by the Asset Purchase Agreement between Seller GI and SPX and explicitly pertained to that Agreement.

96. Mr. Wilz signed in his individual capacity regarding three sections of the Asset Purchase Agreement.

97. The three sections of the Asset Purchase Agreement which Mr. Wilz signed in his individual capacity did not include the dispute resolution process.

98. The SPX Employment Agreement with Mr. Wilz does not contain a dispute resolution process.

99. Under the heading "Choice of Law, Venue," §9 of the SPX Employment Agreement with Mr. Wilz provides: "Venue of any action or dispute of any kind arise from or relating to Employee's employment with Company is limited exclusively to the Courts of the State of Ohio, provided, however, that the Company shall have the right to seek injunctive relief in any court of competent jurisdiction."

100. Once SPX clarifies whether its effective termination of Mr. Wilz is an actual termination, he will make reasonably diligent efforts to secure employment comparable to his position with SPX.

101. Mr. Wilz's reasonably diligent efforts to secure employment comparable to his position with SPX will be thwarted if the non-competition provisions in the Employment Agreement are enforceable.

102. During his few months as an employee with SPX, Mr. Wilz did not acquire information, skills, knowledge, techniques, or other ways to gain an advantage in competition with SPX.

103. Based on a direct-import career lasting more than two decades, Mr. Wilz brought to SPX information, skills, knowledge, techniques, and other ways to gain an advantage in competition with SPX.

104. Requiring Mr. Wilz to avoid competing in North America with SPX for more than six months unduly burdens him.

105. In breaching the Employment Agreement with Mr. Wilz, SPX deprived him of the value for which the restrictive noncompetition covenant was exchanged.

106. SPX's legitimate business interests will be adequately served by Mr. Wilz not disclosing any of its trade secrets or confidential information he may have gleaned during his employment.

107. Had SPX satisfied the covenant of good faith and fair dealing, it would have realized that Mr. Wilz had essentially met the objectives and exhibited the traits and qualifications it had required.

## V. Claim for Relief

108. Paragraphs 1 through 107 above are realleged and incorporated herein.

109. By failing to honor its contractual obligations to Plaintiff and concocting in bad faith cause for his termination, SPX had breached its contract with him and violated the implied covenant of good faith and fair dealing.

## VI. Prayer for Relief

WHEREFORE, Plaintiff prays that this Court:

a. declare that SPX has, in bad faith and in violation of the covenant of good faith and fair dealing, breached its contract with him and rendered the non-competition provisions unenforceable;

b. order an accounting and such other equitable relief as will make him whole; more than $75,000 in damages; prejudgment and post-judgment interest; costs; attorneys' fees, and such other relief as the Court may deem appropriate.

Respectfully submitted,

**OF COUNSEL:**
Louis A. Jacobs (002101)
(*LAJOhio@aol.com*)
177 19th St., Apt. 9C
Oakland, CA 94612
(614) 203-1255
Fax (510) 250-9007

By: *John S. Marshall*
John S. Marshall (0015160)
(*jmarshall@marshallforman.com*)
Edward R. Forman (0076651)
(*eforman@marshallforman.com*)
Samuel M. Schlein (0092194)
(*sschlein@marshallforman.com*)
MARSHALL AND FORMAN LLC
250 Civic Center Dr., Suite 480
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

## JURY DEMAND

Plaintiff requests a trial by a jury of eight (8) persons.

By: *John S. Marshall*
John S. Marshall (0015160)